David **GROGAN**, Plaintiff,

v.

Timothy P. **O'NEIL**, et al., Defendants.

No. CIV.A. 03–2091–KHV.

United States District Court,
D. Kansas.

Nov. 21, 2003.

**1284**

Gregory E. Keller, Harnes Keller, LLP, New York City, James M. Crabtree, Lenexa, KS, for Plaintiff.

Matthew J. Salzman, Kent E. Whittaker, Stinson, Morrison, Hecker, LLP, Kansas City, MO, Timothy M. O'Brien, Shook, Hardy & Bacon, L.L.P., Overland Park, KS, for Defendants.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

For himself and on behalf of similarly situated class members, David Grogan brings suit against Timothy P. O'Neil, Roy R. Laborde, William D. Cox, Harold C. Hill, Jr., Clark D. Stewart, and David D. Taggart for breach of corporate fiduciary duty (Count I). Plaintiff also brings derivative claims on behalf of TransFinancial Holdings, Inc. ("TransFinancial") for corporate waste (Count II) and violation of Delaware statutory law, Del.Code Ann., tit. 8, § 271 (Count III).[1] This matter is before the Court on the *Individual Defendants' Motion To Dismiss Plaintiff's*

*Claims* (Doc. # 14) filed June 13, 2003. For reasons stated below, the Court sustains defendants' motion in part.

### Factual Background

TransFinancial, a holding company, is a Delaware corporation with its principal place of business in Lenexa, Kansas.[2] Prior to December of 2000, TransFinancial operated in three unrelated industries: transportation, financial services and industrial technology. At all relevant times, TransFinancial had 3,252,370 shares of outstanding common stock.

Timothy P. O'Neil, Roy R. Laborde, William D. Cox, Harold C. Hill, Jr., Clark D. Stewart, David D. Taggart, and J. Richard Devlin were directors of TransFinancial.[3] Previously, O'Neil was president and chief executive officer of TransFinancial. Cox is now the chairman of the board.

### I. TransFinancial's Business

In 1991, TransFinancial acquired Crouse Cartage Company ("Crouse") from members of the Crouse family. TransFinancial thereafter engaged in the trucking business through Crouse as a wholly-owned subsidiary.

Crouse was a regional carrier of general commodities in less than truckload ("LTL") quantities.[4] LTL operations require substantial equipment capabilities and an extensive network of terminals. Because LTL business requires a high capital investment, entry into the field is difficult and the Crouse infrastructure had

---

1. Plaintiff also brought a direct claim against TransFinancial for violation of Delaware statutory law, but he has agreed not to pursue that claim. *See Withdrawal Of Motion To Dismiss And Notice Of Non–Prosecution Agreement* (Doc. # 47) filed November 12, 2003.

2. The corporation did not change its name to TransFinancial until 1996, but for ease of reference, the Court refers to the corporation

as TransFinancial during the entire period from 1991 to present.

3. J. Richard Devlin is not a defendant in this case.

4. LTL shipments are less than 10,000 pounds. Regional carriers are those whose average length of haul is less than 500 miles.

significant value.[5] Revenue from Crouse accounted for the vast majority of TransFinancial revenue.[6]

In 1996 and 1997, TransFinancial expanded its trucking operations by opening several new terminals. It also modernized existing terminal facilities. By the first quarter of 1998, TransFinancial reported record operating revenues. TransFinancial net income declined, however, because of investment in market expansion and modernization of fleet and information systems. During this expansion, the Crouse family was involved in the day-to-day operations of TransFinancial. Lawrence Crouse, who had been chief executive officer of Crouse through 1996, served on the TransFinancial board of directors.

In 1995, TransFinancial entered the financial services business. It acquired Agency Premium Resource, a company which financed premium payments for commercial purchasers who wanted to make installment payments for property and casualty insurance instead of paying on an annual basis. In 1996 and 1998, TransFinancial acquired United Premium Acceptance Corporation ("UPAC") and Oxford Premium Finance Company, which also financed insurance premium payments.[7]

In July of 1997, TransFinancial entered the field of industrial technology by acquiring 60 per cent of the common stock of Presis LLC ("Presis"), along with certain rights to equipment which it produced. In 1998, TransFinancial acquired the remaining stock. Presis, a start-up business which works to develop technical advances in dry particle processing, expects to market that process to companies which process pigments used in the production of inks, paints and coatings.

## II. Bids To Take Over TransFinancial In 1998 And 1999

In early 1998, a Management Buyout Group—consisting of defendants O'Neil, Laborde and Cox—owned less than five per cent of the outstanding TransFinancial shares. To entrench itself, the Management Buyout Group wished to adopt anti-takeover provisions. The Crouse family, which owned approximately 22 per cent of outstanding common stock, opposed any anti-takeover device which would hinder their ability to receive a premium for their shares. TJS Partners, L.P. ("TJS"), which held 13.3 per cent of the TransFinancial shares, also opposed any anti-takeover device.

On June 30, 1998, TJS announced that it had agreed to purchase the Crouse interests and that it sought to secure control of TransFinancial. TJS asked the board to cooperate in such a change and stated that if necessary, it would solicit shareholder consent to elect a new board of directors, including Lawrence Crouse. TJS also announced that it intended to engage in an

---

5. Crouse had 68 service locations. In addition, Crouse operated a fleet of tractors and trailers, and maintained a network of terminals to support intercity freight movement.

6. In 1996, transportation had operating revenues of $107,502,000, compared to $6,191,000 for the rest of the Company. In 1997, transportation revenue was $126,062,000, and non-transportation was $7,161,000. In 1998, the numbers were $144,592,000 and $7,109,000, and in 1999, they were $149,125,000 and $8,300,00. In 1997, operating income was $3,136,000; in 1998, it was $2,865,000.

7. In a separate action, UPAC sued Oxford Premium Finance Company for negligent and fraudulent misrepresentation and breach of warranty arising out of the purchase agreement. See *Universal Premium Acceptance Corp. v. Oxford Bank & Trust*, 277 F.Supp.2d 1120 (D.Kan.2003). On October 22, 2003, pursuant to a settlement agreement, the Court dismissed that action.

in-depth study of the business and operations of TransFinancial. TJS further disclosed that it might propose a variety of actions to maximize shareholder value, including the sale of one or more TransFinancial businesses or investments and/or the sale of TransFinancial itself.

Faced with the prospect of removal from office, the Management Buyout Group and other director defendants approved a proposal that TransFinancial purchase all TJS shares at $9.25 per share, for more than $20 million. The transaction closed on August 14, 1998. The repurchase was not for any legitimate business purpose, but was done solely to entrench the Management Buyout Group. In July of 1998, when they were negotiating to buy the TJS shares, defendants implemented a shareholder rights plan to prevent any hostile acquisition of TransFinancial. In February of 1999, they revised that plan to make it even more difficult for a third party to acquire TransFinancial. In addition, in February of 1999, they approved the repurchase of TransFinancial common stock. Between February 25 and April 15, 1999, TransFinancial repurchased 683,241 shares. These shares were not repurchased to further any corporate purpose, but to help the Management Buyout Group take over TransFinancial by increasing its ownership percentage.

On June 7, 1999, the Management Buyout Group formally proposed that it acquire all outstanding stock for $5.25 per share. At that time, the board organized a committee consisting of Devlin, Hill, and Stewart (the "Committee") to consider the proposal. The Committee retained the law firm of Morrison & Hecker ("M & H"), the general counsel of TransFinancial, which had previously advised the board with respect to the buyout of TJS and the adoption of a shareholder rights plan.

On July 15, 1999, the Committee retained the firm of William Blair & Co., LLC ("Blair") to act as its financial advisor and assist in negotiations with the Management Buyout Group or third parties. The Committee did not authorize Blair to actively seek competing bids or to market TransFinancial. TransFinancial nevertheless received several expressions of interest from third parties. On July 27, 1999, M & H received a proposal from Appalachian Company ("Appalachian") to buy all outstanding stock of TransFinancial for $7.00 per share, subject to satisfactory due diligence. On August 13, 1999, M & H received an offer from Crescendo Capital ("Crescendo") to acquire all outstanding stock for $6.00 to $6.50 per share, subject to due diligence. On that same date, M & H also received an expression of interest from Shell Ridge Capital Partners ("Shell Ridge").

Despite these proposals, the Committee did not open bidding to test the market for TransFinancial. Instead, the Committee took steps to stifle such bidding and to favor the Management Buyout Group. First, the Committee advised prospective bidders that it would only consider offers for TransFinancial as a whole, and not for any subsidiaries. Although the component parts of TransFinancial would command a higher price if sold separately, the Committee refused to entertain bids for a sale or liquidation of Crouse alone. The Committee also rejected a proposal by Shell Ridge and an offer by Crescendo to buy only UPAC. In addition, the Committee imposed an arbitrary deadline of less than three weeks on prospective bidders for TransFinancial.[8]

---

8. On September 13 and 14, 1999, the Committee advised prospective purchasers that due diligence at company headquarters had to be completed by September 30, 1999, and that offers had to be made by October 1, 1999. Although the Management Buyout Group had taken months to evaluate a potential acquisition, the Committee required other bidders to submit offers in less than three

Appalachian submitted a cash bid of $7.00 per share for the entire company, subject to adjustments for losses and increases in equity from June 30, 1999, to the date of closing. When asked to submit an unadjusted bid, Appalachian submitted a bid which Blair valued at $6.02 per share. The Management Buyout Group submitted a bid of $5.75 per share. Although Appalachian was prepared to increase its offer, the Committee did not seek a higher offer from Appalachian. Instead, it advised the Management Buyout Group that it would have to submit a bid in excess of $6.00 per share to compete further, and gave the Management Buyout Group an exclusive opportunity to submit one further bid. Based upon this information, the Management Buyout Group submitted a bid valued at $6.03 per share (the "Proposed Management Buyout").

The proposed management buyout was unfair and grossly inadequate.[9] TransFinancial was poised to reap the benefits of extensive capital expenditures that it had undertaken over the past several years, but its stock price was temporarily depressed because of uncertainties regarding corporate control and strikes in the Crouse trucking business.

On October 19, 1999, defendants entered into a merger agreement with the Management Buyout Group. Management attention to the buyout proposal and uncertainty created by that proposal caused a decline in the labor performance of TransFinancial. This decline in turn caused operating expenses for 1999 to increase substantially. As a result of management's inattention to business during this period,

TransFinancial lost more than $8 million, or $2.37 per share—even though its operating revenue rose approximately four per cent in 1999, from $151.7 million to $157.6 million.

In February of 2000, TransFinancial announced that the Management Buyout Group had not obtained financing for its proposal. At the time, TransFinancial had no other available transactions. Its financial performance had deteriorated because management had been distracted by efforts to buy the company. Accordingly, the price that interested parties were willing to pay for TransFinancial assets had declined. Thereafter, defendants abandoned any effort to manage the company or preserve shareholder value, and they did not attempt to sell the Company as a whole.

### III. Liquidation Of Crouse And Other TransFinancial Subsidiaries

In September of 2000, TransFinancial announced that it was liquidating Crouse, which constituted substantially all of the assets on the TransFinancial balance sheet. Defendants took this action without a shareholder vote. They also liquidated Crouse assets in a manner that did not bring fair value to TransFinancial or its shareholders. Specifically, in December of 2000, TransFinancial sold most of the Crouse assets to an auction house, Roberts Truck Sales ("Roberts"). Although companies customarily consign their equipment to auctioneers who retain about 10 per cent of the proceeds, TransFinancial received only 50 per cent of the

---

weeks. The short timetable not only disadvantaged existing bidders; it also precluded others from entering the auction. The Committee had no legitimate business reason to place such an arbitrary deadline for the receipt of offers.

9. The proposed management buyout was less than half the TransFinancial book value of $14.44 per share. It was $3.22 per share less than what defendants had deemed to be a fair price, just ten months earlier, when purchasing the shares of TJS. No intervening material change in the business of TransFinancial justified such a price disparity.

fair market value of the equipment by virtue of its outright sale to Roberts.

After they liquidated Crouse, defendants sold the remaining businesses of TransFinancial pursuant to a liquidation plan. Those sales have netted far less than what the third parties bid in 1999. The liquidation produced less than $2.70 per share as of July of 2002, when TransFinancial made a liquidating distribution to its shareholders.

## IV. Procedural History

In January of 2000, in the Delaware Chancery Court, David Grogan filed suit against O'Neil, Laborde, Cox, Devlin, Hill, Stewart, Taggart and TransFinancial. In *Grogan*, plaintiff sought to enjoin the proposed sale to the Management Buyout Group. After TransFinancial abandoned the proposed sale, plaintiff amended his claims, alleging that the officers and directors had breached their fiduciary duties by failing to solicit other bids and failing to complete a sale which would maximize shareholder value.[10] At some point, plaintiff added claims that TransFinancial violated Section 271 of the Delaware Corporation Code, Del.Code Ann., tit 8, § 271(a), by selling Crouse assets without TransFinancial shareholder approval.

The parties later stipulated that *Grogan* should be dismissed and on November 1, 2002, the Delaware court dismissed it. On February 28, 2003, Grogan filed this suit in the District of Kansas. In this case, Grogan asserts the same state law claims which he asserted in the Delaware action.[11] Count I is a putative class claim which alleges that the director defendants, having determined in 1999 that TransFinancial should be sold, violated their fiduciary duties under Delaware law (including their duty of loyalty) by failing to seek and obtain the best possible transaction in the sale of TransFinancial and failing to maximize shareholder value. Count II is a derivative claim which alleges that in December of 2000, defendants liquidated Crouse assets for a fraction of their value and thus committed corporate waste under Delaware law. Count III is a derivative claim which alleges that the TransFinancial liquidation began with the sale of Crouse, which constituted substantially all of the corporate assets, without shareholder approval required by Section 271 of the Delaware Corporation Code.[12]

### Analysis

## I. Count I—Class Claim For Failure To Maximize Shareholder Value Under *Revlon*

■ On behalf of plaintiff and the putative class, Count I alleges that defendants violated their fiduciary duties to TransFinancial shareholders by favoring the Management Buyout Group (O'Neil, Laborde and Cox) and in violation of their duties under *Revlon v. MacAndrews & Forbes*

---

10. Both parties refer to this claim as the "*Revlon* claim" based on *Revlon v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1986).

11. All defendants in this case were defendants in the Delaware action, but J. Richard Devlin, who was a party in the Delaware action, is not a defendant in this case.

12. On December 7, 2001, in the District of Kansas, Lewis F. Geer, another TransFinancial shareholder, filed a putative class action complaint against TransFinancial, Cox, Laborde, O'Neil, Hill, Stewart, Central States Pension Fund, Bankers Trust Company, R & L Investments and R & L Transfer. *Geer v. Cox*, 242 F.Supp.2d 1009. In *Geer*, plaintiff asserts both direct and derivative claims against TransFinancial and the individual defendants, alleging that Crouse sold assets without TransFinancial shareholder approval in violation of Section 271 of the Delaware Corporation Code. Plaintiff also asserts a claim for conversion against all defendants except TransFinancial.

*Holdings, Inc.,* 506 A.2d 173 (Del.1986), failed to obtain the best possible transaction to maximize shareholder value.[13] Defendants ask the Court to dismiss Count I because (1) the Court lacks diversity jurisdiction over the claim, (2) the TransFinancial exculpatory provision bars the claim, (3) the claim is moot because TransFinancial abandoned the merger with the Management Buyout Group, and (4) plaintiff cannot state a claim based on a transaction which TransFinancial ultimately abandoned.[14] Defendants first argue that Count I should be dismissed because it alleges an insufficient amount in controversy and the Court therefore lacks diversity jurisdiction under 28 U.S.C. § 1332. Defendants do not deny that Counts II and III, which are derivative claims on behalf of TransFinancial, satisfy the amount in controversy requirement of Section 1332. While defendants argue that the Court lacks diversity jurisdiction over Count I, the Court need not address that question if supplemental jurisdiction over Count I is proper under 28 U.S.C. § 1367, and it clearly is.

Where a federal court has original jurisdiction over some claims in a civil action, it may exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Plaintiff's claims re-garding the Crouse liquidation (Counts II and III) and the management buyout offer (Count I) involve a significant overlap of factual and legal issues. *See Order* (Doc. # 34) filed August 15, 2003 at 4. Plaintiff alleges that the Crouse liquidation resulted in part from the failed management buyout and breaches of fiduciary duty by defendants. The factual issues related to the proposed management buyout (Count I) are significantly intertwined with the factual issues related to the ultimate liquidation of Crouse assets (Counts II and III). Defendants do not dispute plaintiff's argument on this point. For these reasons, the Court finds that even if diversity jurisdiction would not otherwise exist as to Count I, that count forms part of the same case or controversy as Counts II and III. Because the Court has diversity jurisdiction over Counts II and III, it has supplemental jurisdiction over Count I under 28 U.S.C. § 1367(a).

■ While defendants' motion to dismiss Count I for lack of diversity jurisdiction is without merit, the parties' arguments on the subject raise the question why plaintiff seeks to pursue his *Revlon* claim in the class action context. In his opposition brief, plaintiff maintains that the putative class—which is composed of TransFinancial shareholders—seeks to enforce a common and undivided interest in the total value of TransFinancial. *See Plaintiff's Brief In Opposition To Defen-*

---

13. Because this is a diversity action, the Court applies Kansas choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). "The generally accepted rule is that a corporation's charter and the laws of its domicile govern with respect to the fact and duration of corporate existence and the rights and liabilities of its officers, stockholders, and directors." *Consolidated Beef Indus., Inc. v. Schuyler,* 239 Kan. 38, 40–41, 716 P.2d 544, 547 (1986). Because TransFinancial is a Delaware corporation, the Court applies Dela-ware law. The parties agree that Delaware law applies.

14. Defendants also seek to dismiss Count I to the extent that plaintiff attempts to state a claim for breach of the duty of due care. Plaintiff responds that the complaint does not assert a separate claim for breach of the duty of due care, and that such allegations are merely relevant to other claims. The Court therefore overrules defendants' motion to dismiss on this ground.

*dants' Motion To Dismiss* (Doc. # 27) at 43–49. In that regard, plaintiff acknowledges that individual shareholder suits are not ordinarily permitted when shareholders share a common injury to the value of their stock and that the actual injury for wrongful depletion of corporate assets is to the corporation and only indirectly to shareholders. *See id.* at 45–46 (citing *Eagle v. Am. Tel. & Tel. Co.,* 769 F.2d 541 (9th Cir.1985) and 12B Fletcher Cyclopedia of the Law of Private Corporations § 5913). Defendants argue that by attempting to demonstrate that the class claims should be aggregated for amount in controversy purposes under Section 1332, plaintiff has conceded that his *Revlon* claim should have been brought as a derivative one. The Court tends to agree. The Delaware Supreme Court has noted the somewhat vague and difficult distinction between a derivative action and an individual or direct action. *See Grimes v. Donald,* 673 A.2d 1207, 1213 (Del.1996). The distinction depends upon "the nature of the wrong alleged and the relief, if any, which could result if plaintiff were to prevail." *Kramer v. W. Pac. Indus., Inc.,* 546 A.2d 348, 353 (Del.Supr.Ct.1988) (further quotations and citations omitted). To pursue a direct action, a stockholder "must allege more than an injury resulting from a wrong to the corporation." *Id.* at 351. Instead, a shareholder must state a claim for "an injury which is separate and distinct from that suffered by other shareholders, ... or a wrong involving a contractual right of a shareholder ... which exists independently of any right of the corporation." *Grimes,* 673 A.2d at 1213 (quoting *Moran v. Household Int'l, Inc.,* 490 A.2d 1059, 1070 (Del.Ch.), *aff'd,* 500 A.2d 1346 (Del.Supr.Ct.1985)).

In their reply brief, defendants argue that plaintiff only asserts injury to the corporation and indirect injury to the shareholders based on their pro rata share of the corporation, and that he therefore cannot maintain a direct claim. *See Grimes,* 673 A.2d at 1213; *see also Kramer,* 546 A.2d at 353 (claim based on devaluation of stock collectively shared by all shareholders is derivative in nature); *Atwood Grain & Supply Co. v. Growmark, Inc.,* 712 F.Supp. 1360, 1364 (N.D.Ill.1989) (claim that directors did not act in best interest of corporation during sale of assets is derivative in nature). Defendants' argument appears to be well taken, but they did not raise it until their reply brief. Therefore the Court will not sustain it at this time. Rather than requiring defendants to file a new motion to dismiss, however, the Court orders that on or before **December 1, 2003,** plaintiff show cause why the Court should not dismiss Count I under Rule 12(b)(6) based on the failure to plead Count I as a derivative claim.[15] On or before **December 11, 2003,** defendants may file a response.

## II. Count II—Derivative Claim For Corporate Waste

On behalf of TransFinancial, Count II asserts a derivative claim for corporate waste, based on the sale of Crouse equipment to an auction house in December of 2000. Plaintiff maintains that by selling the equipment directly to the auction house, rather than the having the auction house sell it on consignment, TransFinancial received about half of what it should have received for the equipment. Defendants ask the Court to dismiss Count II because (1) plaintiff cannot state a claim for corporate waste, (2) the TransFinancial

---

**15.** Because Count I does not appear to be properly brought as a direct claim, the Court need not reach defendants' other arguments for dismissal of Count I. If the Court does not dismiss Count I for failure to plead as a derivative claim, defendants may re-assert their arguments as to Count I in a subsequent motion.

exculpatory provision bars the claim and (3) plaintiff did not make demand on the board or allege that demand would have been futile.

A. *Failure To State A Claim*

■ A corporate waste claim ordinarily involves board approval of an exchange of corporate assets for consideration "so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade." *Lewis v. Vogelstein,* 699 A.2d 327, 336 (Del.Ch.1997); *see Brehm v. Eisner,* 746 A.2d 244, 263 (Del.2000) (describing waste as exchange so one-sided that no business person of ordinary, sound judgment could conclude that corporation received adequate consideration); *Grobow v. Perot,* 539 A.2d 180, 189 (Del.Supr.Ct.1988) (waste depends on whether what corporation received is so inadequate that no person of ordinary, sound business judgment would deem it worth what corporation paid). "As a practical matter, a stockholder plaintiff must generally show that the board irrationally squandered corporate assets—for example, where the challenged transaction served no corporate purpose or where the corporation received no consideration at all." *White v. Panic,* 783 A.2d 543, 554 (Del. 2001) (quotations and citations omitted). A corporate waste claim must fail if "there is *any substantial* consideration received by the corporation, and ... there is a *good faith judgment* that in the circumstances the transaction is worthwhile." *Brehm,* 746 A.2d at 263 (emphasis in original). Courts are ill-fitted to weigh the adequacy of consideration or after the fact, to judge appropriate degrees of business risk. *White,* 783 A.2d at 554; *Brehm,* 746 A.2d at 263. Absent "some reasonable doubt that the [ ] board proceeded based on a good faith assessment of the corporation's best interests, the board's decisions are entitled to deference under the business judgment rule." *White,* 783 A.2d at 554.

■ Defendants argue that plaintiff has failed to state a claim for corporate waste because he has not alleged that "no consideration" was received or that the transaction was essentially "a gift." *Memorandum In Support Of Individual Defendants' Motion To Dismiss* (Doc. 315) filed June 13, 2003 at 30. Such allegations will suffice, but they are not required to state a corporate waste claim. *See Vogelstein,* 699 A.2d at 336 (waste claim "most often associated" with transfer that serves no corporate purpose or for which corporation receives no consideration; such transfer is in effect a gift). As explained above, the test is whether the amount which the corporation received was so inadequate that no reasonable businessperson would conclude that it received adequate consideration. *See Brehm,* 746 A.2d at 263; *Vogelstein,* 699 A.2d at 336 (1997); *Grobow,* 539 A.2d at 189.

Here, plaintiff has alleged that defendants approved a transaction in which TransFinancial received only one half the fair market value of the Crouse assets, that the transaction served no valid business purpose and that no reasonable businessperson would have engaged in the transaction. *See* Complaint ¶¶ 59–60, 72. On a motion for summary judgment or at trial, defendants may ultimately establish that a reasonable businessperson could have chosen to sell the assets directly to the auction house. At this juncture, however, the Court must accept plaintiff's allegation as true. The Court therefore overrules defendants' motion to dismiss Count II for failure to state a claim.

B. *TransFinancial Exculpatory Provision*

■ Defendants argue that the TransFinancial exculpatory charter provision bars plaintiff's corporate waste claim. On

a motion to dismiss under Rule 12(b)(6), the Court may take judicial notice of certain facts without converting the motion to one for summary judgment. *See Cruz v. Melecio,* 204 F.3d 14, 21 (1st Cir.2000); *Leonard F. v. Israel Discount Bank of New York,* 199 F.3d 99, 107 (2d Cir.1999); *Barron v. Reich,* 13 F.3d 1370, 1377 (9th Cir.1994); *Davis v. United Student Aid Funds, Inc.,* 45 F.Supp.2d 1104, 1106 (D.Kan.1998); *see also GFF Corp. v. Associated Wholesale Grocers,* 130 F.3d 1381, 1384 (10th Cir.1997) (if document is referred to in, but not attached to, complaint and is central to plaintiff's claim, defendant may submit indisputably authentic copy to be considered on motion to dismiss). Delaware courts have taken judicial notice of a corporate exculpatory charter provision where the defendant has presented a certified copy of such a provision on file with the secretary of state. *See In re Baxter Int'l, Inc. Shareholders Litig.,* 654 A.2d 1268, 1270 (Del.Ch.1995); *see also McMillan v. Intercargo Corp.,* 768 A.2d 492, 501 n. 40 (Del.Ch.2000). Though the articles of incorporation attached to defendants' memorandum in support of their motion to dismiss appear to be authentic and plaintiff has not contested their accuracy, they constitute a matter outside the complaint and they are not properly authenticated. *See Malpiede v. Townson,* 780 A.2d 1075, 1090–92 (Del.2001).

In deciding a motion to dismiss, the Court may not consider evidence outside the pleadings unless it converts the motion to one for summary judgment. *See Prager v. LaFaver,* 180 F.3d 1185, 1188–89 (10th Cir.1999); *see also Malpiede,* 780 A.2d at 1090–92 (because defendants did not satisfy requirements for judicial notice for charter provision and it was not found within complaint, chancery court should have excluded provision or converted Rule

12(b)(6) motion to one for summary judgment under Rule 56).[16] The Court has broad discretion to convert a Rule 12(b)(6) motion to a motion for summary judgment in order to consider matters outside the pleadings. *See id.* The Court declines to do so, however, in this case. The parties have not asked the Court to convert the motion, and the Court has not notified the parties that it will apply a summary judgment standard. Moreover, while defendants refer to matters outside plaintiff's complaint, their motion to dismiss does not contain a concise statement of material facts which is required by D. Kan. Rule 56.1. Accordingly, the Court overrules defendants' motion to dismiss based on the TransFinancial exculpatory charter provision.

■ Even if the Court took judicial notice of the unauthenticated certificate of incorporation attached to defendants' memorandum in support of their motion, it would overrule defendants' motion to dismiss. The TransFinancial articles of incorporation provide:

> No director shall be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty by such Director as a Director. Notwithstanding the foregoing sentence, a Director shall be liable to the extent provided by applicable law:
>
> (i) for breach of the Director's duty of loyalty to the Corporation or its stockholder[s];
>
> (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law;
>
> (iii) pursuant to Section 174 of the General Corporation Law; or

**16.** Rules 12(b)(6) and 56 of the Delaware Chancery Court Rules are substantially identical to the analogous rules in the Federal Rules of Civil Procedure.

(iv) for any transaction from which the Director derived an improper personal benefit.

Exhibit A to the *Memorandum In Support Of Individual Defendants' Motion To Dismiss* (Doc. # 15) filed June 13, 2003. Delaware law permits such provisions in order to protect directors from claims for breach of their duty of care. Del.Code Ann. tit. 8, § 102(b)(7).[17]

Defendants contend that Count II should be dismissed because plaintiff has not alleged that defendants had a financial interest in the Crouse liquidation or that they acted in bad faith. As explained above, however, plaintiff's complaint states a corporate waste claim based on the Crouse liquidation. The standards for corporate waste and bad faith are similar: to prevail on either claim, plaintiff must show that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests. *White,* 783 A.2d at 554 n. 36. Defendants do not dispute that bad faith may be inferred where the board's decision is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any other ground." *Individual Defendants' Reply Brief In Support Of Their Motion To Dismiss* (Doc. # 42) at 49 (quoting plaintiff's opposition brief); *In re Rexene Corp. Shareholders Litig.,* 1991 WL 77529, at *4 (Del.Ch. May 8, 1991); *In re J.P. Stevens & Co., Inc. Shareholders Litig.,* 542 A.2d 770, 780 (Del.Ch.1988). Accordingly, the sole question is whether plaintiff alleges facts from which a jury could reasonably infer that the board's decisions were beyond the bounds of reasonable judgment.

As noted, plaintiff alleges that no reasonable businessperson would have liquidated Crouse in the manner that the board chose and that TransFinancial received only 50 per cent of market value for Crouse. *See Complaint* ¶¶ 59–60, 72. On a motion to dismiss, the Court must accept as true plaintiff's allegations that the board decision was beyond the bounds of reasonable judgment, *i.e.* that the board did not have any valid business reason to choose such a transaction, particularly when an alternative transaction (sale of the assets by consignment) would have yielded 90 per cent of fair market value. TransFinancial apparently received cash from the auction house and no other consideration. In this type of transaction, plaintiff's allegations create a much stronger inference that when defendants accepted approximately 50 per cent less cash than an alternative transaction, they acted in bad faith. Therefore the Court overrules defendants' motion to dismiss Count II based on the TransFinancial exculpatory charter provision.

## C.   *Failure to Make Demand On Board*

■   To assert a derivative action, as in Count II, plaintiff must comply with the demand requirement of Rule 23.1, Fed. R.Civ.P. Rule 23.1 provides that "[t]he complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or

---

**17.** The statutory provision provides in part that corporate articles of incorporation may include:

A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.

Del.Code Ann. tit. 8, § 102(b)(7).

members, and the reasons for plaintiff's failure to obtain the action or for not making the effort." The Court applies federal procedural rules to determine whether the allegations of the complaint satisfy the particularity requirement of Rule 23.1 and state substantive law to determine whether demand on the board would have been futile. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96–97, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). The parties agree that the Court should apply Delaware substantive law because TransFinancial is a Delaware corporation.

As to the pleading requirements for demand on the board, Rule 23.1 serves a special purpose, and requires a different judicial approach than the general notice pleading requirements. *See In re Kauffman Mut. Fund Actions*, 479 F.2d 257, 263 (1st Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973). Particularity under Rule 23.1 requires substantially more than notice pleading and the "liberal pleading requirements" do not apply. *Kaufman v. Kan. Gas & Elec. Co.*, 634 F.Supp. 1573, 1578 (D.Kan.1986). Rule 23.1 requires plaintiff to allege "particularized factual statements" which excuse the demand requirement. *See Brehm*, 746 A.2d at 254.[18]

■ To excuse demand under Delaware law, plaintiff must allege facts which create a reasonable doubt that "(1) the directors are disinterested and independent" or "(2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del.1984); *see Grobow*, 539 A.2d at 186. To satisfy the first prong of *Aronson* under the federal pleading standard,[19] plaintiff "must plead particularized facts demonstrating either a financial interest or entrenchment on the part of the . . . directors." *Id.* at 188. To satisfy the second prong of *Aronson*, plaintiff must plead particularized facts which "raise a reasonable doubt that the directors exercised proper business judgment in the transaction." *Id.* at 189.

■ Plaintiff argues that he meets both prongs of *Aronson*. The Court need not address the first prong because the particularized factual allegations in plaintiff's complaint create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment. As explained above, plaintiff has stated a claim for corporate waste under Rule 12(b)(6). Plaintiff's allegations are sufficient to create reasonable doubt that the decision to accept a liquidation for 50 per cent of market value was the product of a valid exercise of reasonable judgment. Plaintiff alleges that defendants did not attempt to shop Crouse, that they engaged in a fire sale of the subsidiary, that they did not seek shareholder approval of the liquidation, and that they did not have any valid business reason to choose such a transaction, particularly when an alternative transaction (sale of the assets by consignment) would have yielded 90 per cent of fair market value. *See Complaint* ¶¶ 58–61, 72. Even under the heightened pleading standard of Rule 23.1, plaintiff has alleged with the requisite particularity why the decision to sell Crouse assets is not entitled to deference under the business judgment rule.[20] Because plaintiff's

---

18. *Brehm* applied Delaware Chancery Rule 23.1, but the demand and particularity requirement of Rule 23.1, Fed.R.Civ.P., is nearly identical to those requirements in Delaware Chancery Rule 23.1.

19. *Aronson* applied the standard of pleading in Delaware Chancery Rule 23.1, but as noted above, the Delaware and federal procedural rules are nearly identical.

20. The Court notes that based on nearly identical allegations, the Honorable Julie A. Robinson of this Court held that the complaint in *Geer* alleged with sufficient particularity grounds for excusing plaintiff's failure to

allegations create a reasonable doubt that the challenged decision is protected by the business judgment rule, demand on the board is excused under *Aronson.* For these reasons, the Court overrules plaintiff's motion to dismiss Count II based on plaintiff's failure to make demand on the TransFinancial board.

## III. Count III—Derivative Claim For Violation Of Section 271 Of The Delaware Corporate Code

On behalf of TransFinancial, Count III asserts that defendants violated Section 271 of the Delaware Corporation Code in liquidating the Crouse assets.[21] Section 271 provides:

> Every corporation may at any meeting of its board of directors or governing body sell, lease or exchange all or substantially all of its property and assets, including its goodwill and its corporate franchises, upon such terms and conditions and for such consideration, which may consist in whole or in part of money or other property, including shares of stock in, and/or other securities of, any other corporation or corporations, as its board of directors or governing body deems expedient and for the best interests of the corporation, when and as authorized by a resolution adopted by the holders of a majority of the outstanding stock of the corporation entitled to vote thereon . . . .

Del.Code Ann., tit. 8, § 271(a). The individual defendants seek dismissal of Count III because (1) the TransFinancial exculpatory provision bars the claim and (2) plaintiff did not make demand on the board or allege that such demand would have been futile.

### A. Exculpatory Charter Provision

■ Defendants argue that the TransFinancial exculpatory charter provision bars Count III. As explained above, because defendants have not provided an authenticated copy of the charter provision, the Court cannot take judicial notice of it and must overrule defendants' Rule 12(b)(6) motion on this ground. Even if the Court took judicial notice of the unauthenticated certificate of incorporation attached to defendants' memorandum in support of their motion, it would overrule defendants' motion to dismiss. As previously noted, the TransFinancial articles of incorporation provide:

> No director shall be personally liable to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty by such Director as a Director. Notwithstanding the foregoing sentence, a Director shall be liable to the extent provided by applicable law:
>
> (i) for breach of the Director's duty of loyalty to the Corporation or its stockholder[s];
>
> (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law;
>
> (iii) pursuant to Section 174 of the General Corporation Law; or
>
> (iv) for any transaction from which the Director derived an improper personal benefit.

Exhibit A to the *Memorandum In Support Of Individual Defendants' Motion To Dismiss* (Doc. # 15) filed June 13, 2003.

Defendants maintain that plaintiff's complaint does not allege facts that support a claim of bad faith in connection with the

---

make demand on the TransFinancial board. *See Geer v. Cox,* 242 F.Supp.2d 1009, 1021 (D.Kan.2003).

**21.** Plaintiff also asserted a direct claim against TransFinancial for violation of Section 271, but he has agreed not to pursue that claim. *See supra* note 1.

Crouse liquidation. For reasons explained above, the Court rejects defendants' argument. Plaintiff has alleged sufficient facts to create an inference that defendants acted in bad faith by liquidating Crouse for 50 per cent of market value without shareholder approval. Therefore the Court overrules defendants' motion to dismiss Count III based on the TransFinancial exculpatory charter provision.

**B.** *Demand On TransFinancial Board*

■ As to Count III, defendants assert that plaintiff has not satisfied either prong of demand futility as outlined in *Aronson.* The Court rejects defendant's argument for the reasons outlined above. In particular, plaintiff's complaint creates reasonable doubt that the challenged transaction (including both the decision to accept 50 per cent of market value and the decision to engage in the liquidation without a shareholder vote) resulted from the valid exercise of business judgment. Accordingly, the Court overrules defendants' motion to dismiss Count III for failure to make demand on the TransFinancial board.

**IT IS THEREFORE ORDERED** that *Individual Defendants' Motion To Dismiss Plaintiff's Claims* (Doc. # 14) filed June 13, 2003 be and hereby is **OVERRULED.** On or before **December 1, 2003,** plaintiff shall show cause why the Court should not dismiss Count I under Rule 12(b)(6) based on the failure to plead Count I as a derivative claim. On or before **December 11, 2003,** defendants may file a response.