ATWOOD GRAIN & SUPPLY COMPANY, et al., Plaintiffs,

v.

GROWMARK, INC., et al., Defendants.

No. 88 C 7442.

United States District Court, N.D. Illinois, E.D.

May 19, 1989.

---

Robert C. Keck, Jr., W. Joseph Thesing, Jr., Wm. B. Hines, Jenner & Block, Chicago, Ill., for plaintiffs.

Duane C. Quaini, Alan S. Gilbert, Roger K. Heidenreich, Sonnenschein Carlin Nath & Rosenthal, Chicago, Ill., Timothy C. Klenk, Terry Satinover, Pope, Ballard, Shepard & Fowle, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

Plaintiffs are each shareholders in Growmark, Inc., a Delaware corporation. Plaintiffs, in their individual capacity, seek damages against Growmark and complain that Growmark's Board of Directors fraudulently made decisions involving the sale of corporate assets which reduced the value of plaintiffs' shares, ignored plaintiffs' voting rights and deprived plaintiffs of the Growmark grain marketing system. In their seven count complaint plaintiffs allege that Growmark and Kenneth P. Baer, an officer at Growmark (referred to collectively as "Growmark") violated the Securities Exchange Act of 1934, violated Racketeer Influenced and Corrupt Organizations Act (RICO), engaged in common law fraud,

breached their corporate fiduciary duties, and plaintiffs request that this court establish a constructive trust in their favor. The federal securities claim and the RICO claims are also directed at Archer Daniels Midland Company (ADM), who was the purchaser of some of Growmark's assets.[1]

Defendants each filed a Motion to Dismiss the Complaint on the grounds that plaintiffs 1) lack standing to sue in their individual capacity, 2) lacked any legal right to vote on the transactions effected by Growmark's board, and 3) lacked any legal right to the services they claim to have lost as a result of the transactions.

## I. FACTS

### A. Background

Each plaintiff is an independent cooperative association which owns grain storage facilities. Each grain facility has farmers who are its members and sell them grain. Plaintiffs, in turn, sell and transport the grain to various regional agricultural cooperatives, such as defendant-Growmark, Inc., of which plaintiffs are members. In addition to membership status, at all relevant times, each plaintiff held one share of Series G Common Stock in Growmark. Before becoming shareholders in Growmark, plaintiffs owned shares in the Illinois Grain Corporation (IGC), an agricultural marketing cooperative which owned seven grain elevators along the Illinois and Mississippi Rivers. IGC was also a shareholder in Farmers Export Company which owned a grain elevator in Ama, Louisiana.

IGC gave a rebate of a portion of its net profits to its members each year, reflecting the amount of business conducted by the member with IGC. IGC often distributed these "patronage rebates" partially in cash and partially in Class E Preferred Stock. The Class E stock was distributed in amounts reflecting the retained earnings to which each member was entitled. The retained earnings were then used to make further capital investment for the benefit of the owners. In addition, Class E Preferred Shareholders received dividends each year. IGC instituted a stock redemption plan and by 1976, except for the amount required for the plaintiffs to maintain a minimum investment in IGC, all the Class E Preferred Stock issued prior to 1972 had been redeemed.

Growmark, a Delaware corporation with its principal offices in Bloomington, Illinois, was formed in 1980 when IGC combined its operations with another agricultural cooperative, FS Services, Inc. IGC was a grain cooperative and FS Services was a supply cooperative, which provided fertilizers, seeds and other supplies to its members. As part of the combination, IGC transferred to Growmark the grain storage and handling facilities which had been capitalized by plaintiffs and other IGC members. At the time of the transfer plaintiffs' investment in the grain handling facilities and their retained earnings in IGC's books (and subsequently Growmark's books) was approximately $2.75 million. After the merger Growmark operated in two unincorporated divisions—a supply division and a grain division. Members of one division receive no benefit from and do no business with the other divisions of Growmark unless they are members of that division. IGC shareholders became members of the grain division and accepted Growmark's G Series Preferred Stock in exchange for their IGC stock. As G series members of Growmark plaintiffs were also entitled to trade their grain through the Illinois Cooperative Futures Company (ICFC) at reduced commission rates. ICFC owned six seats on the Chicago Board of Trade.

Plaintiffs contend that between March 1980 and October 1985 Growmark used the retained earnings allocated to each plaintiff's series G account but barred plaintiffs from realizing any return on their investment. During that time Growmark claimed losses in the grain business and refused to pay G series members any grain

---

**1.** In response to defendants' Motion to Dismiss and supporting memorandum of law, plaintiffs filed an amended complaint. Apparently, plaintiffs recognized the deficiencies in their first complaint and sought to remedy them. Pursuant to Fed.R.Civ.P. 15(a) plaintiff is entitled to amend its complaint once, without leave of the court, before a responsive pleading is served.

patronage rebates and refused to redeem any of plaintiffs' preferred stock.

### B. The Transactions

Archer Daniels Midland Company (ADM) is a grain processor and marketer and also owns grain elevators. On September 5, 1985, Growmark entered into a contract with ADM pursuant to which Growmark agreed to sell the river elevators it had acquired from IGC to ADM in exchange for ADM Common Stock (the "Asset Sale").

Growmark held two meetings, on September 5, the date the deal was consummated, and on September 23 to explain the transaction to the shareholders. At the meetings Growmark told the shareholders they anticipated the sale would benefit them. Plaintiffs now complain that Growmark failed to disclose the financial terms and the Asset Plan to shareholders and that shareholders were never permitted to vote on the transaction. Plaintiffs also object to the sale of the Louisiana grain elevator to ADM by Farmers Export Company (FEC). Growmark is a shareholder in FEC and voted for that sale, and plaintiffs complain that they should have been consulted. Plaintiffs contend that the consideration paid for the Growmark facilities was less than their market value and thus deprived them of the full value of their stock holdings.

A year and a half after the Asset Sale, Growmark exercised its majority shareholder status in ICFC, a corporation which traded grain future contracts on the Chicago Board of Trade, to liquidate the firm. According to plaintiffs this deprived them of the reduced commission rates on grain trades, the last remaining benefit of their G series membership. Plaintiffs complain they should have been permitted to vote on this transaction.

### II. DISCUSSION

#### A. Corporate Status

##### 1. Standing

■ Plaintiffs admit that Growmark is a corporate entity organized under the corporate laws of the state of Delaware. Plaintiffs also freely admit that they are shareholders of Growmark. Nonetheless, plaintiffs contend, they are exempt from the well-established rules which govern the shareholder-corporation relationship. They argue that their cooperative-like arrangement is a unique entity in which the shareholders assume a special role and thus should not be held to the same restrictions imposed on shareholders of a more traditional corporation. According to plaintiffs their relationship with Growmark is more closely analogous to a trustee-beneficiary relationship and the rules governing that arrangement should apply here. Plaintiffs offer no case authority for their extraordinary proposition that corporate laws should be disregarded in this litigation.

The Board's duty to plaintiffs in this case and the extent of plaintiffs' right to approve Board decisions with respect to the transactions depends on the characterization of the parties, as Professor Scott in his comprehensive treatise on trusts writes:

> ... the extent of the duty of loyalty is not necessarily the same in all fiduciary relations, and what constitutes a violation of duty by one kind of fiduciary does not necessarily constitute violation of duty by another kind of fiduciary.

V A.W. Scott, *Law of Trusts* sec. 495, 3534 (3d ed. 1967). Although their argument is unclear, it seems that plaintiffs believe that despite the fact Growmark chose to organize under Delaware's general corporate laws, and not the cooperative agricultural association laws, because Growmark acts like a cooperative they are entitled to the special status afforded cooperatives by Delaware law. Even if we agree, plaintiffs would not be entitled to the rights with respect to the corporation that they claim.

An agricultural cooperative is a convenient instrumentality which enables farmers living in the same vicinity to act together for their mutual benefit in cultivating, harvesting and marketing their products. 3 C.J.S. *Agriculture* sec. 138 (1973 & Supp. 1988). Title 3, sec. 8561 of the Delaware Code Annotated grants this type of association a tax exemption. Notwithstanding this special status, the Delaware cooperative law also requires that a cooperative

obtain a certificate of incorporation from the Secretary of State "similar to those issued to corporations organized under the general corporate law of this State...." Del.Code tit. 3, sec. 8504 (1988). The rules in Title 3 which apply to cooperatives are similar to the rules applying to businesses incorporated in Delaware. Title 3, however, does not elaborate on the fiduciary duty between the member and the association. Delaware, like many other states, seeks to encourage agriculture productivity by legislating special incentives for business entities that qualify as agricultural cooperatives; there is no reason to believe, however, that Delaware intended to obviate the theory of the corporation in this context.

But in any event plaintiffs are organized under Delaware corporate law, they cannot claim the advantages of the corporate form and reject their corporate status when it no longer serves their purpose. *Sams v. Redevelopment Authority of the City of New Kensington*, 431 Pa. 240, 244 A.2d 779, 781 (1968). To the extent that plaintiffs' claims rely on their being in a relationship other than that of shareholders to the corporation, these claims cannot survive a motion to dismiss.

### 2. Nature of Claims

■ Shareholders may bring direct actions, both as individuals and as a class, for injuries done to them in their individual capacities as corporate fiduciaries. R. Clark, *Corporate Law* sec. 15.9, at 662–64 (1986). However, if the shareholders' complaint is primarily for harm to the corporation they may not sue in their individual capacity, they must sue on behalf of the corporation; this is called the shareholder derivative suit. Ordinarily, any recovery in a derivative suit will go to the corporation. An action is derivative "if the gravamen of the complaint is injury to the corporation, or the whole body of its stock or property

without any severance or distribution among individual holders, or if it seeks to recover assets for the corporation or to prevent the dissipation of its assets." 12B Fletcher, *Cyclopedia of Corporations* sec. 5911, at 285 (1984 & Supp.1988). The distinction between derivative and individual actions thus depends upon the party directly injured by the alleged wrongdoing. *Kramer v. Western Pacific Industries, Inc.*, 546 A.2d 348 (Del.1988).

Plaintiffs state three claims against the Board: that its unilateral decision to sell certain assets denied them their right to vote on the transaction, caused the value of their stock to decrease and lost them their access to the grain marketing system. In other words, plaintiffs' claim is essentially that the directors did not act in the best interest of the corporation when they sold the assets. This claim is derivative in nature. Furthermore if the cause of action is based on acts relating solely to a particular class of stock or the stock in its entirety, it is generally a corporate cause of action. *Clinton Hudson & Sons v. Lehigh Val. Coop. Farms*, 73 F.R.D. 420 (E.D.Pa.1977), *aff'd without opinion*, 586 F.2d 834 (3rd Cir.1978) (*quoting* 12B Fletcher, *supra*, sec. 5915, at 296). Plaintiffs have failed to show that there was any duty owed to them that was not owed to all shareholders of their status, or that they suffered any harm individually, thus their individual claims must be dismissed.[2]

### B. The Claims

#### 1. Voting Rights

■ Even if plaintiffs had shown that they suffered a direct or personal injury their complaint suffers from numerous defects. Plaintiffs' contention that they were entitled to vote on the transaction effected by the Growmark Board is without merit. The shareholders of a corporation have sought a unique business arrangement, in which they deliberately agree to remove

---

**2.** We note that even if plaintiffs' general claims were not derivative, they have no standing as individuals to bring their specific allegations under Rule 10b–5 of the Securities Exchange Act of 1934. It is well established that in the context of a corporation's purchase of stock involving fraud or misrepresentation, its shareholders have standing to sue only in a derivative suit on behalf of the corporation. *Ray v. Karris*, 780 F.2d 636 (7th Cir.1985); *Rathborne v. Rathborne*, 683 F.2d 914, 919 n. 16 (5th Cir.1982).

themselves from the daily operation of the business. As absentee owners, shareholders must agree to delegate a certain amount of authority to the managers of the corporation.

A well-established tenet of corporate law holds that a board of directors acting in the "ordinary and regular course of business", *Philadelphia National Bank v. B.S.F. Co.*, 199 A.2d 557 (Del.Ch.1964), *rev'd on other grounds,* 204 A.2d 746 (Del.1964), may sell, lease or exchange less than "substantially all the corporate assets" without shareholder approval. 8 Del.C. sec. 271(a) (requires shareholder approval for the sale of "all or substantially all" the assets of a Delaware corporation). *See also Gimbel v. Signal Cos.,* 316 A.2d 599, 605 (Del.Ch.), *aff'd,* 316 A.2d 619 (Del.1974). The purpose of the consent statute is to protect the shareholders from a fundamental corporate change without their approval, that is to ensure that the shareholders are not prevented from achieving the benefits or purpose for which the corporation was incorporated. *See Gimbel,* 316 A.2d at 606, *quoting,* 6A Fletcher, *supra.,* sec. 2949.2, at 648.

To accomplish the purpose of the consent statute "ordinary and regular course of business" need not limit the director to just daily business activities. *Gimbel,* 316 A.2d at 606. Plaintiff does not contend that the Asset Sale was outside Growmark's ordinary business activity, nonetheless this issue must be resolved first to determine whether the Board requires shareholder approval. Delaware applies a quantitative test for this determination. If the sale of the assets is quantitatively vital to the operation of the corporation, is out of the ordinary and substantially affects the existence and purpose of the corporation, then it is beyond the authority of the directors. 6A Fletcher, *supra.,* sec. 2949.3, at 637–38.

Without reaching the issue of whether the Asset Sale was a wise business choice, we find that the sale was in the course of regular business and therefore within the Board's authority. Plaintiffs say that their affiliation with Growmark or IGC was to facilitate the distribution of their goods.

In the past Growmark and its predecessor IGC had frequently changed their business structure, and this particular business change should be regarded in light of Growmark's claimed losses in the grain business during this period. The decision to sell assets in exchange for stock in ADM, a grain processor which also owned grain elevators, appears consistent with the Board's regular business function to facilitate the distribution of plaintiffs' product.

Because we hold that this transaction was an ordinary business decision, plaintiffs need only have been consulted by the Board if the assets sold consisted of all or substantially all of the business assets. In *Gimbel v. Signal Cos.,* the Delaware court specified that the sale of merely an independent or important branch of the corporate business is insufficient to require shareholder approval. 316 A.2d at 605. *See also Whittaker Corp. v. Edgar,* 535 F.Supp. 933 (N.D.Ill.1982) (applying Delaware law, the court found that shareholder approval is not required when a corporation sells a subsidiary, unless the subsidiary accounts for all or substantially all of the corporation's assets).

Plaintiffs do not argue that the Asset Sale consisted of all or substantially all the assets of Growmark, instead they attempt to circumvent the statute's limitations by arguing that the structure of Growmark was such that after the merger of IGC and FS Services, the grain and supply divisions remained so independent of each other that they were actually separate corporations. If this is true, the sale consisted of substantially all the assets of the grain division and shareholders had to be consulted. Although plaintiffs do not articulate any recognized corporate theory to lend support to their argument, we assume they rely on the *de facto* corporation doctrine to find that two corporations exist where, in fact, only one is organized under Delaware law.

The *de facto* doctrine is a judicial creation used to bridge a legal gap where corporate privileges have been exercised by a corporation which had failed to comply with statutory incorporation requirements.

H. Henn. & J. Alexander, *Laws on Corporations* sec. 140, at 329–36 (1983 & Supp. 1986). The purpose of the doctrine is to protect parties who deal with a business on the assumption that it is regulated by corporate laws. Courts are necessarily hesitant to apply this fiction and will only do so—in the interest of public policy—upon a finding that the alleged corporation has met particular criteria which will make it a *de facto* corporation. Generally the doctrine will be evoked where a statute exists under which the business could have incorporated; there is a colorable attempt to comply with such statute and where there is some use or exercise of corporate privileges. Most courts also add an element of fairness to the parties involved in the analysis. *See* Henn & Alexander, *supra.*

Plaintiffs cannot argue that there was any deliberate attempt to incorporate the grain division. The mere fact that the two divisions operated separately is insufficient to find two corporations. The Supreme Court has noted specifically that even when a corporation is divided into completely autonomous divisions it should be scrutinized as a single entity: "the existence of an unincorporated division reflects no more than a firm's decision to adopt an organizational division of labor." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984). The Supreme Court further noted that to do otherwise would be an unsound policy, "a rule that punished coordinated conduct simply because a corporation delegated certain responsibilities to autonomous units might well discourage corporations from creating divisions with their presumed benefits." *Id.* Even if, as plaintiffs contend, Growmark maintains separate patronage rebate accounts and separate membership qualification for its G series shareholders (shareholders who are members of the grain division) and that G series holders do not benefit in any way from the operation of the supply division,

this does not justify imposing independent status on the grain division. Furthermore, plaintiffs deliberately ceased being shareholders in only the grain cooperative when they exchanged their shares in ICG, a grain cooperative, for shares in Growmark which operated both a grain and a supply divisions. Gromark is a single corporation and substantially all of its assets were not sold, therefore, plaintiffs' claim that the Board should have consulted them under Del.Code sec. 271 must fail.[3]

Given this conclusion, the common law fraud count, the RICO count and Securities fraud counts must be dismissed. These claims are all based upon an alleged scheme where Growmark sold parts of its grain business without disclosing material information to its shareholders. If plaintiffs had no right to approve the transaction and the Board of Directors had the sole right, then as a matter of law, if a disinterested Board acted on full information, the shareholders are attributed with full information. *Maldonado v. Flynn*, 597 F.2d 789, 793 (2d Cir.1979) (applying Delaware law).

### 2. Reduction in Benefits

■ Plaintiffs allege that they were injured by the Asset Sale because it diminished the marketing services they previously enjoyed by their association with Growmark, and they suffered a loss in their share value. Courts are traditionally reluctant to review the substance of a board of directors' corporate decisions. This reluctance stems from the fact that it can only examine the business decision and its context in retrospect, and directors, usually businessmen, are presumed more competent to make these decisions. Thus, frequently a court will find that the business judgment rule shields directors from liability even when shareholders contest their decision-making ability.[4] *E.g.*, *Aronson v.*

---

3. Plaintiffs complain that they were not allowed to approve Growmark's vote in favor of the sale of the Louisiana grain elevator or the dissolution of ICFC. Beyond this bare complaint, plaintiffs do not discuss the basis of their right. Under the same analysis we pursued above,

pursuant to sec. 271 of the Delaware code, plaintiffs' consent is not required.

4. The theory behind the business judgment rule is that directors are not required to guarantee that their decisions will succeed, rather they are

*Lewis*, 473 A.2d 805, 812 (Del.1984). Directors are immune from liability, however, only if they have fulfilled certain obligations vis-a-vis the shareholders and the corporation. The duty of care requires directors to exercise the degree of skill, diligence and care that a reasonably prudent business person would exercise in similar circumstances.[5] *Smith v. Van Gorkom*, 488 A.2d 858 (Del.1985).

In *Smith v. Van Gorkom*, the Delaware Supreme Court stated that directors' duty means taking appropriate steps to inform themselves prior to making a business decision. The *Van Gorkom* court reviewed the board's decision-making procedure and only when they found that the directors did not pursue a conscientious decision-making process did the court interfere and hold that the directors were liable to the corporation. 488 A.2d 858 (the directors did not adequately investigate the CEO's role in initiating sale of the company or his means at arriving at the per share sale price, the board was not sufficiently informed regarding the intrinsic value of the company before agreeing to the sale, and the company proceeded in haste, deliberating for only two hours, before agreeing to the sale without any apparent justification).

In this case plaintiffs do not quibble with the specific procedure by which the Board reached a decision, but rather they are unhappy with the effects of the decision and the Board's failure to consult the shareholders. Furthermore, the record is sparse as to the details of how and why the Directors made their decision to sell. It seems, however, that the Board was diligent in making the decision. It was not the first time the business structure of the grain division was changed, the Board retained an interest in the grain elevators by acquiring ADM stock, two meetings were held to inform the plaintiffs and all this must be regarded in the context that the Directors presumably were attempting to prevent further losses to the grain division. Plaintiffs' dissatisfaction with the result of this business decision is not appropriate for our review.

### 3. Constructive Trust

██ Plaintiffs seek imposition of a constructive trust on the ADM stock held by Growmark in an amount equal to the retained earnings allegedly attributable to their shares. A constructive trust is an involuntary trust which arises by operation of law; whereby a court will remove title from the legal owner, who holds it unfairly, and "convey that interest to one to whom it justly belongs." *Commodity Futures Trading Comm'n v. Heritage Capital Advisory Services, Ltd.*, 823 F.2d 171, 172 (7th Cir.1987), *quoting, Gravitt v. Jennings*, 79 Ill.App.3d 286, 34 Ill.Dec. 720, 398 N.E.2d 395 (Ill.App.1979). It is an equitable remedy which only may be imposed upon a showing of wrongdoing on the part of the legal owner of the property. *Com-*

only expected to use ordinary and reasonable care in making corporate policy. Few directors would serve on boards if the merits of their decisions were subject to substantive scrutiny and, more importantly, ventures which have potential for great profit, but which entail some risk would be stifled. *See Joy v. North*, 692 F.2d 880, 885 (2d Cir.1982).

**5.** In general, corporate laws seek to strike a balance between the need to have a board of directors with sufficient independence to effectively operate the affairs of the corporation and simultaneously ensure that ultimately the shareholders'—the true owners'—interests are effected. Certain common law methods exist to maintain the balance between shareholders' interest and managerial discretion. On one hand, the duty of care (discussed above) and the duty of loyalty protect shareholders. The duty of loyalty monitors the directors' conduct by re-

quiring directors to act with the utmost allegiance to the corporation. *See* Henn & Alexander, *supra.*, sec. 235, at 625–28. On the other hand, the presumption of the business judgment rule—that directors act in good faith and on an informed basis—allows directors broad discretion to conduct corporate activities. The rule assumes that, unless proven otherwise, when directors make a corporate decision, they act on an informed basis, in good faith and believe that their action is taken in the best interest of the corporation. Johnson & Osborne, *The Role of the Business Judgment Rule in a Litigious Society*, 15 Val.U.L.Rev. 49 (1980). Thus, a court will invoke the business judgment rule and refuse to scrutinize the merits of the business decision made by business persons who are likely more competent in the particular business matters at issue.

*modity Futures Trading Comm'n,* 823 F.2d at 172. We find that Growmark has not been involved in any wrongdoing and do not impose a constructive trust.

### III. CONCLUSION

Growmark has made no pretense of being any type of business entity other than a corporation and plaintiffs' are its shareholders. There is no reason that traditional corporate law rules should not apply to this litigation. Plaintiffs have failed to demonstrate that they suffered any injury independent of the corporation. Their claims are specific to the entire class of G series stock. Plaintiffs' only option is to bring suit on behalf of the corporation. For this reason, plaintiffs' seven count complaint, brought in their individual capacity, against Growmark and ADM alleging RICO violations, securities fraud violations, common law fraud violation and breach of fiduciary duties must be dismissed.

Even if plaintiffs had standing to sue in their individual capacity their claims have no merit. Under well-recognized theories of corporate law Growmark's Directors had no obligation to consult plaintiffs-shareholders before effecting any of the complained of transactions, and shareholders were not entitled to any of the services they claim they have lost. Plaintiffs have failed to demonstrate that there was any unfairness, fraud, misrepresentation or lack of due care in the transactions approved by the Board, and we will refrain from substantive review of the Directors' business decision.

For the reasons stated above the complaint against all defendants is dismissed.