**David GROGAN, Plaintiff,**

v.

**Timothy P. O'NEIL, et al., Defendants.**

**No. CIV.A. 03–2091–KHV.**

United States District Court,
D. Kansas.

March 15, 2004.

1182

Gregory E. Keller, Harnes Keller LLP, New York City, James M. Crabtree, Lenexa, KS, for Plaintiff.

Matthew J. Salzman, Kent E. Whittaker, Stinson Morrison Hecker LLP, Kansas City, MO, Timothy M. O'Brien, Shook, Hardy & Bacon L.L.P., Overland Park, KS, for Defendants.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

For himself and on behalf of similarly situated class members, David Grogan brings suit against Timothy P. O'Neil, Roy

R. Laborde, William D. Cox, Harold C. Hill, Jr., Clark D. Stewart, and David D. Taggart for breach of corporate fiduciary duty (Count I). Plaintiff also brings derivative claims on behalf of TransFinancial Holdings, Inc. ("TransFinancial") for corporate waste (Count II) and violation of Delaware statutory law, Del.Code Ann., tit. 8, § 271 (Count III).[1] On November 21, 2003, the Court ordered plaintiff to show cause why the Court should not dismiss Count I under Rule 12(b)(6), based on failure to plead Count I as a derivative claim. *See Memorandum And Order* (Doc. # 51) at 23. This matter is before the Court on *Plaintiff's Supplemental Brief In Response To The Court's Order, Dated November 21, 2003* (Doc. # 52) filed December 1, 2003. For reasons stated below, plaintiff has shown cause why the Court should not dismiss Count I.

### Factual Background

Plaintiff's complaint alleges the following facts:

TransFinancial, a holding company, is a Delaware corporation with its principal place of business in Lenexa, Kansas.[2] Prior to December of 2000, TransFinancial operated in three unrelated industries: transportation, financial services and in-

dustrial technology. At all relevant times, TransFinancial had 3,252,370 shares of outstanding common stock. Timothy P. O'Neil, Roy R. Laborde, William D. Cox, Harold C. Hill, Jr., Clark D. Stewart, David D. Taggart and J. Richard Devlin were directors of TransFinancial.[3] Previously, O'Neil was president and chief executive officer of TransFinancial. Cox is now the chairman of the board.

### I. TransFinancial's Business

In 1991, TransFinancial acquired Crouse Cartage Company ("Crouse") from members of the Crouse family. TransFinancial thereafter engaged in the trucking business through Crouse as a wholly-owned subsidiary.

Crouse was a regional carrier of general commodities in less than truckload ("LTL") quantities.[4] LTL operations require substantial equipment capabilities and an extensive network of terminals. Because LTL business requires a high capital investment, entry into the field is difficult and the Crouse infrastructure had significant value.[5] Revenue from Crouse accounted for the vast majority of TransFinancial revenue.[6]

In 1996 and 1997, TransFinancial expanded its trucking operations by opening several new terminals. It also modernized

---

1. Plaintiff also brought a direct claim against TransFinancial for violation of Delaware statutory law, but he has agreed not to pursue that claim. *See Withdrawal Of Motion To Dismiss And Notice Of Non–Prosecution Agreement* (Doc. # 47) filed November 12, 2003.

2. The corporation did not change its name to TransFinancial until 1996, but for ease of reference, the Court refers to the corporation as TransFinancial during the entire period from 1991 to present.

3. Devlin is not a defendant in this case.

4. LTL shipments are less than 10,000 pounds. Regional carriers are those whose average length of haul is less than 500 miles.

5. Crouse had 68 service locations. In addition, Crouse operated a fleet of tractors and trailers, and maintained a network of terminals to support intercity freight movement.

6. In 1996, transportation had operating revenues of $107,502,000, compared to $6,191,000 for the rest of the Company. In 1997, transportation revenue was $126,062,000, and non-transportation was $7,161,000. In 1998, the numbers were $144,592,000 and $7,109,000, and in 1999, they were $149,125,000 and $8,300,000. In 1997, operating income was $3,136,000; in 1998, it was $2,865,000.

existing terminal facilities. By the first quarter of 1998, TransFinancial reported record operating revenues. TransFinancial net income declined, however, because of investment in market expansion and modernization of fleet and information systems. During this expansion, the Crouse family was involved in the day-to-day operations of TransFinancial. Lawrence Crouse, who had been chief executive officer of Crouse through 1996, served on the TransFinancial board of directors.

In 1995, TransFinancial entered the financial services business. It acquired Agency Premium Resource, a company which financed premium payments for commercial purchasers who wanted to make installment payments for property and casualty insurance instead of paying on an annual basis. In 1996 and 1998, TransFinancial acquired United Premium Acceptance Corporation ("UPAC") and Oxford Premium Finance Company, which also financed insurance premium payments.[7]

In July of 1997, TransFinancial entered the field of industrial technology by acquiring 60 per cent of the common stock of Presis LLC ("Presis"), along with certain rights to equipment which it produced. In 1998, TransFinancial acquired the remaining stock. Presis, a start-up business which works to develop technical advances in dry particle processing, expects to market that process to companies which process pigments used in the production of inks, paints and coatings.

## II. Bids To Take Over TransFinancial In 1998 And 1999

In early 1998, a Management Buyout Group—consisting of defendants O'Neil,

Laborde and Cox—owned less than five per cent of the outstanding TransFinancial shares. To entrench itself, the Management Buyout Group wished to adopt anti-takeover provisions. The Crouse family, which owned approximately 22 per cent of outstanding common stock, opposed any anti-takeover device which would hinder their ability to receive a premium for their shares. TJS Partners, L.P. ("TJS"), which held 13.3 per cent of the TransFinancial shares, also opposed any anti-takeover device.

On June 30, 1998, TJS announced that it had agreed to purchase the Crouse interests and that it sought to secure control of TransFinancial. TJS asked the board to cooperate in such a change and stated that if necessary, it would solicit shareholder consent to elect a new board of directors. TJS also announced that it intended to engage in an in-depth study of the business and operations of TransFinancial. TJS further disclosed that it might propose a variety of actions to maximize shareholder value, including the sale of one or more TransFinancial businesses or investments and/or the sale of TransFinancial itself.

Faced with the prospect of removal from office, the Management Buyout Group and other director defendants approved a proposal that TransFinancial purchase all TJS shares at $9.25 per share, for more than $20 million. The transaction closed on August 14, 1998. The repurchase was not for any legitimate business purpose, but was done solely to entrench the Management Buyout Group. In July of 1998,

---

**7.** In a separate action, UPAC sued Oxford Premium Finance Company for negligent and fraudulent misrepresentation and breach of warranty arising out of the purchase agreement. *See Universal Premium Acceptance* *Corp. v. Oxford Premium Fin. Co.,* No. 02–2448–KHV (D.Kan.). On October 22, 2003, pursuant to a settlement agreement, the Court dismissed that action.

when they were negotiating to buy the TJS shares, defendants implemented a shareholder rights plan to prevent any hostile acquisition of TransFinancial. In February of 1999, they revised that plan to make it even more difficult for a third party to acquire TransFinancial. In addition, in February of 1999, they approved the repurchase of TransFinancial common stock. Between February 25 and April 15, 1999, TransFinancial repurchased 683,241 shares. These shares were not repurchased to further any corporate purpose, but to help the Management Buyout Group take over TransFinancial by increasing its ownership percentage.

On June 7, 1999, the Management Buyout Group formally proposed that it acquire all outstanding stock for $5.25 per share. At that time, the board organized a committee consisting of Devlin, Hill and Stewart (the "Committee") to consider the proposal. The Committee retained the law firm of Morrison & Hecker ("M & H"), the general counsel of TransFinancial, which had previously advised the board with respect to the buyout of TJS and the adoption of a shareholder rights plan.

On July 15, 1999, the Committee retained the firm of William Blair & Co., LLC ("Blair") to act as its financial advisor and assist in negotiations with the Management Buyout Group or third parties. The Committee did not authorize Blair to actively seek competing bids or to market TransFinancial. TransFinancial nevertheless received several expressions of interest from third parties. On July 27, 1999, M & H received a proposal from Appala-

chian Company ("Appalachian") to buy all outstanding stock of TransFinancial for $7.00 per share, subject to satisfactory due diligence. On August 13, 1999, M & H received an offer from Crescendo Capital ("Crescendo") to acquire all outstanding stock for $6.00 to $6.50 per share, subject to due diligence. On that same date, M & H also received an expression of interest from Shell Ridge Capital Partners ("Shell Ridge").

Despite these proposals, the Committee did not open bidding to test the market for TransFinancial. Instead, the Committee took steps to stifle such bidding and to favor the Management Buyout Group. First, the Committee advised prospective bidders that it would only consider offers for TransFinancial as a whole, and not for any individual subsidiaries. Although the component parts of TransFinancial would command a higher price if sold separately, the Committee refused to entertain bids for a sale or liquidation of Crouse alone. The Committee also rejected a proposal by Shell Ridge and an offer by Crescendo to buy only UPAC. In addition, the Committee imposed on prospective bidders for TransFinancial an arbitrary deadline of less than three weeks.[8]

Appalachian submitted a cash bid of $7.00 per share for the entire company, subject to adjustments for losses and increases in equity from June 30, 1999, to the date of closing. When asked to submit an unadjusted bid, Appalachian submitted a bid which Blair valued at $6.02 per share. The Management Buyout Group

---

8. On September 13 and 14, 1999, the Committee advised prospective purchasers that due diligence at company headquarters had to be completed by September 30, 1999, and that offers had to be made by October 1, 1999. Although the Management Buyout Group had taken months to evaluate a potential acquisition, the Committee required other bidders to submit offers in less than three weeks. The short timetable not only disadvantaged existing bidders; it also precluded others from entering the auction. The Committee had no legitimate business reason to place such an arbitrary deadline for the receipt of offers.

submitted a bid of $5.75 per share. Although Appalachian was prepared to increase its offer, the Committee did not seek a higher offer from Appalachian. Instead, it advised the Management Buyout Group that it would have to submit a bid in excess of $6.00 per share to compete further, and gave the Management Buyout Group an exclusive opportunity to submit one further bid. Based upon this information, the Management Buyout Group submitted a bid valued at $6.03 per share (the "Proposed Management Buyout").

The proposed management buyout was unfair and grossly inadequate.[9] TransFinancial was poised to reap the benefits of extensive capital expenditures that it had undertaken over the past several years, but its stock price was temporarily depressed because of uncertainties regarding corporate control and strikes in the Crouse trucking business.

On October 19, 1999, defendants entered into a merger agreement with the Management Buyout Group. Management attention to the buyout proposal and uncertainty created by that proposal caused a decline in the labor performance of TransFinancial. This decline in turn caused operating expenses for 1999 to increase substantially. As a result of management's inattention to business during this period, TransFinancial lost more than $8 million, or $2.37 per share—even though its operating revenue rose approximately four per cent in 1999, from $151.7 million to $157.6 million.

In February of 2000, TransFinancial announced that the Management Buyout Group had not obtained financing for its proposal. At the time, TransFinancial had no other available transactions. Its finan-cial performance had deteriorated because management had been distracted by efforts to buy the company. Accordingly, the price that interested parties were willing to pay for TransFinancial assets had declined. Thereafter, defendants abandoned any effort to manage the company or preserve shareholder value, and they did not attempt to sell the Company as a whole.

### III. Liquidation Of Crouse And Other TransFinancial Subsidiaries

In September of 2000, TransFinancial announced that it was liquidating Crouse, which constituted substantially all of the assets on the TransFinancial balance sheet. Defendants took this action without a shareholder vote. They also liquidated Crouse assets in a manner that did not bring fair value to TransFinancial or its shareholders. Specifically, in December of 2000, TransFinancial sold most of the Crouse assets to an auction house, Roberts Truck Sales ("Roberts"). Although companies customarily consign their equipment to auctioneers who retain about 10 per cent of the proceeds, TransFinancial received only 50 per cent of the fair market value of the equipment by virtue of its outright sale to Roberts.

After they liquidated Crouse, defendants sold the remaining businesses of TransFinancial pursuant to a liquidation plan. Those sales have netted far less than what the third parties bid in 1999. The liquidation produced less than $2.70 per share as of July of 2002, when TransFinancial made a liquidating distribution to its shareholders.

---

9. The proposed management buyout was less than half the TransFinancial book value of $14.44 per share. It was $3.22 per share less than what defendants had deemed to be a fair price, just ten months earlier, when purchasing the shares of TJS. No intervening material change in the business of TransFinancial justified such a price disparity.

## IV. Procedural History

In January of 2000, in the Delaware Chancery Court, David Grogan filed suit against O'Neil, Laborde, Cox, Devlin, Hill, Stewart, Taggart and TransFinancial. In *Grogan*, plaintiff sought to enjoin the proposed sale to the Management Buyout Group. After TransFinancial abandoned the proposed sale, plaintiff amended his claims, alleging that the officers and directors had breached their fiduciary duties by failing to solicit other bids and failing to complete a sale which would maximize shareholder value.[10] At some point, plaintiff added claims that TransFinancial violated Section 271 of the Delaware Corporation Code, Del.Code Ann., tit. 8, § 271(a), by selling Crouse assets without TransFinancial shareholder approval.

The parties later stipulated that *Grogan* should be dismissed and on November 1, 2002, the Delaware court dismissed it. On February 28, 2003, Grogan filed this suit in the District of Kansas. In this case, Grogan asserts the same state law claims which he asserted in the Delaware action.[11] Count I is a putative class claim which alleges that the director defendants, having determined in 1999 that TransFinancial should be sold, violated their fiduciary duties under Delaware law (including their duty of loyalty) by failing to seek and obtain the best possible transaction in the sale of TransFinancial and failing to maximize shareholder value. Count II is a derivative claim which alleges that in December of 2000, defendants liquidated Crouse assets for a fraction of their value and thus committed corporate waste under Delaware law. Count III is a derivative claim which alleges that the TransFinancial liquidation began with the sale of Crouse, which constituted substantially all of the corporate assets, without shareholder approval required by Section 271 of the Delaware Corporation Code.[12]

On November 21, 2003, the Court overruled defendants' motion to dismiss Counts II and III and ordered plaintiff to show cause why the Court should not dismiss Count I for failure to plead a derivative claim. *See Memorandum And Order* (Doc. # 51) at 23.

### Analysis

■ On behalf of plaintiff and the putative class, Count I alleges that defendants violated their fiduciary duties to TransFinancial shareholders by favoring the Management Buyout Group (O'Neil, Laborde and Cox) and in violation of their duties under *Revlon v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1985), failed to obtain the best possible transaction to maximize shareholder value.[13] As

---

**10.** Both parties refer to this claim as the "*Revlon* claim" based on *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1985).

**11.** All defendants in this case were defendants in the Delaware action, but Devlin, who was a party in the Delaware action, is not a defendant in this case.

**12.** On December 7, 2001, in the District of Kansas, Lewis F. Geer, another TransFinancial shareholder, filed a putative class action complaint against TransFinancial, Cox, Laborde, O'Neil, Hill, Stewart, Central States Pension Fund, Bankers Trust Company, R &

L Investments and R & L Transfer. *Geer v. Cox*, No. 01–2583–JAR. In *Geer*, plaintiff asserts both direct and derivative claims against TransFinancial and the individual defendants, alleging that Crouse sold assets without TransFinancial shareholder approval in violation of Section 271 of the Delaware Corporation Code. Plaintiff also asserts a claim for conversion against all defendants except TransFinancial.

**13.** Because this is a diversity action, the Court applies Kansas choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). "The generally accepted rule is that a

explained above, the management buyout was not consummated because the Management Buyout Group could not obtain financing for its proposal. On Count I, plaintiff seeks damages for the lost opportunity of TransFinancial shareholders to obtain a price for their shares in excess of the management buyout offer. *See Derivative And Class Action Complaint* (Doc. # 1) ¶ 69. As stated above, the Court ordered plaintiff to show cause why the Court should not dismiss Count I under Rule 12(b)(6) for failure to plead a derivative claim. *See Memorandum And Order* (Doc. # 51) at 23. In response, plaintiff maintains that the Court should treat Count I as a direct claim and, alternatively, if the Court treats Count I as a derivative claim, that demand on the TransFinancial board was excused.

■ The Delaware Supreme Court has noted the somewhat vague and difficult distinction between a derivative action and an individual or direct action. *See Grimes v. Donald*, 673 A.2d 1207, 1213 (Del.1996). The distinction depends upon "the nature of the wrong alleged and the relief, if any, which could result if plaintiff were to prevail." *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del.Supr.1988) (further quotations and citations omitted). To pursue a direct action, a stockholder "must allege more than an injury resulting from a wrong to the corporation." *Id.* at 351. Instead, a shareholder must state a claim for "an injury which is separate and distinct from that suffered by other shareholders, ... or a wrong involving a contractual right of a shareholder ... which exists independently of any right of the corporation." *Grimes*, 673 A.2d at 1213 (quoting *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1070 (Del.Ch.), *aff'd*, 500 A.2d 1346 (Del.Supr.1985)).

■ Plaintiff argues that *Revlon* claims have uniformly been brought as individual or class actions. *See Plaintiff's Supplemental Brief In Response To The Court's Order, Dated November 21, 2003* (Doc. # 52) at 4 (citing *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914 (Del. 2003) and *McMullin v. Beran*, 765 A.2d 910 (Del.2000)).[14] Neither case cited by plaintiff addresses the distinction between direct and derivative actions. More importantly, both cases involve claims that directors breached fiduciary duties to minority shareholders only. *See Omnicare*, 818 A.2d at 918–19, 929, 937; *McMullin*, 765 A.2d at 918–19. Here, in contrast, plaintiff maintains that the putative class—which is composed of all TransFinancial shareholders (except the Management Buyout Group)—seeks to enforce a common and undivided interest in the total value of TransFinancial. *See Plaintiff's (Corrected) Brief In Opposition To Defendants' Motion To Dismiss* (Doc. # 28) at 43–49. Although plaintiff has not included the Management Buyout Group in the proposed class, members of

corporation's charter and the laws of its domicile govern with respect to the fact and duration of corporate existence and the rights and liabilities of its officers, stockholders, and directors." *Consolidated Beef Indus., Inc. v. Schuyler*, 239 Kan. 38, 40–41, 716 P.2d 544, 547 (1986). Because TransFinancial is a Delaware corporation, the Court applies Delaware law. The parties agree that Delaware law applies.

**14.** Many of plaintiff's citations omit a pinpoint reference, which is a basic requirement for a good legal brief. *See The Bluebook: A Uniform System of Citation*, Rule 3.3(a), at 35 (17th ed. 2000) ("When referring to specific material within ... a source, include both the page on which the source begins and the page on which the specific material appears, separated by a comma"); *The University of Chicago Manual of Legal Citation*, Rule 4.2(a)(iii), at 16 (1989) ("Indicate the particular pages of the case that support the proposition in text."). In future briefs, the Court would greatly appreciate plaintiff's attention to this protocol.

that group suffered the same alleged injury as all TransFinancial shareholders, *i.e.* a reduced price for their shares.

Plaintiff also argues that the Court must determine whether he has alleged "special injury," but other than a reduced price for his shares, he cites no specific injury that he suffered. *Plaintiff's Supplemental Brief In Response To The Court's Order, Dated November 21, 2003* (Doc. # 52) at 3–4. Plaintiff does not directly respond to the cases cited in the Court's order to show cause, which hold that a plaintiff who asserts only indirect injury to shareholders based on their pro rata shares of the corporation cannot maintain a direct claim. *See Memorandum And Order* (Doc. # 51) at 12 (citing *Grimes,* 673 A.2d at 1213; *Kramer,* 546 A.2d at 353; and *Atwood Grain & Supply Co. v. Growmark, Inc.,* 712 F.Supp. 1360, 1364 (N.D.Ill.1989)). Plaintiff also ignores his previous acknowledgment that individual shareholder suits are not ordinarily permitted when shareholders share a common injury to the value of their stock and his further acknowledgment that the actual injury for wrongful depletion of corporate assets is to the corporation and only indirectly to shareholders. *See Plaintiff's (Corrected) Brief In Opposition To Defendants' Motion To Dismiss* (Doc. # 28) at 45–46 (citing *Eagle v. Am. Tel. & Tel. Co.,* 769 F.2d 541 (9th Cir.1985) and 12B Fletcher Cyclopedia of the Law of Private Corporations § 5913).

Plaintiff previously characterized Count I as follows:

> In this case, the TransFinancial shareholders have a common and undivided right to the benefit of the transaction that would have produced the highest value for TransFinancial, either by sale of the Company as a whole, or in parts. The claim in Count I is based upon a common and undivided obligation and liability—the defendants' duty to maximize the company's value at a sale for the TransFinancial stockholders' benefit. All TransFinancial shareholders have a common interest in the maximized value, and the fact that the individual plaintiffs' beneficial interests may be of "fixed proportion," does not alter the fact that their interest is common.

*Plaintiff's (Corrected) Brief In Opposition To Defendants' Motion To Dismiss* (Doc. # 28) at 49. Plaintiff also noted that each shareholder has an undivided interest in the corporation's assets. *See id.* n. 12. Based on the allegations of Count I and plaintiff's previous characterization of the claim, the Court treats Count I as a derivative claim.[15] *See Grimes,* 673 A.2d at 1213; *Kramer,* 546 A.2d at 353; *Atwood Grain,* 712 F.Supp. at 1364.

---

**15.** In an effort to avoid Count I being construed as a derivative claim, plaintiff states:

> Plaintiff's claim is not that TransFinancial was made less valuable during the auction process, but that the Board wrongfully approved a transaction that did not pay full value to plaintiff and the class. Of equal importance, the parties affected were not all TransFinancial shareholders, but the class of public shareholders other than the Management Buyout Group.

*Plaintiff's Supplemental Brief In Response To The Court's Order, Dated November 21, 2003* (Doc. # 52) at 7. Plaintiff's statement contradicts his earlier acknowledgment that Count I alleges that "all TransFinancial shareholders" lost the benefit of a transaction which would have maximized the value of TransFinancial. *Plaintiff's (Corrected) Brief In Opposition To Defendants' Motion To Dismiss* (Doc. # 28) at 49. In addition, if Count I does not allege that TransFinancial lost value because of or during the auction process, *see Plaintiff's Supplemental Brief In Response To The Court's Order, Dated November 21, 2003* (Doc. # 52) at 7–8 (corruption of bidding process did not impose any injury or effect upon TransFinancial as an entity), the Court has significant doubts that plaintiff can prove any damages on a direct claim. As explained above, plaintiff seeks damages for the lost opportunity to obtain a price in excess of the Management

■ Plaintiff argues that even as a derivative claim, the Court should not dismiss Count I because the complaint alleges facts to establish that board demand would have been futile. *See* Fed.R.Civ.P. 23.1. To assert a derivative action, plaintiff must comply with the demand requirement of Rule 23.1 which provides that "[t]he complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for plaintiff's failure to obtain the action or for not making the effort." The Court applies federal procedural rules to determine whether the allegations of the complaint satisfy the particularity requirement of Rule 23.1 and state substantive law to determine whether demand on the board would have been futile. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96–97, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991). The parties agree that the Court should apply Delaware substantive law because TransFinancial is a Delaware corporation.

As to the pleading requirements for demand on the board, Rule 23.1 serves a special purpose, and requires a different judicial approach than the general notice pleading requirements. *See In re Kauffman Mut. Fund Actions*, 479 F.2d 257, 263 (1st Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973). Particularity under Rule 23.1 requires substantially more than notice pleading and the "liberal pleading requirements" do not apply. *Kaufman v. Kan. Gas & Elec. Co.*, 634 F.Supp. 1573, 1578 (D.Kan.1986). Rule 23.1 requires plaintiff to allege "particularized factual statements" which excuse the demand requirement. *See Brehm v. Eisner*, 746 A.2d 244, 254 (Del.2000).[16]

■ To excuse demand under Delaware law, plaintiff must allege facts which create a reasonable doubt that "(1) the directors are disinterested and independent" or "(2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814 (Del.1984); *see Grobow*, 539 A.2d at 186. To satisfy the first prong of *Aronson* under the federal pleading standard,[17] plaintiff "must plead particularized facts demonstrating either a financial interest or entrenchment on the part of the ... directors." *Id.* at 188. To satisfy the second prong of *Aronson*, plaintiff must plead particularized facts which "raise a reasonable doubt that the directors exercised proper business judgment in the transaction." *Id.* at 189.

Buyout Group offer, *i.e.* the difference between what a willing buyer would have paid during the auction process and the price which plaintiff eventually received after the Management Buyout Group proposal failed. If plaintiff is correct in insisting that the total value of TransFinancial was not influenced by the auction process, the value of the company and the price which a buyer was willing to pay for the company necessarily declined for other reasons. Therefore, as to a direct claim, plaintiff apparently suffered only nominal damages, if any.

Plaintiff's response to the show cause order articulates some facts which tend to support a direct claim. Currently, however, Count I pleads only a derivative claim for damages based on plaintiff's pro rata share of the corporation. On or before **March 29, 2004**, plaintiff may seek leave to amend his complaint to add a direct claim based on the auction process.

16. *Brehm* applied Delaware Chancery Rule 23.1, but the demand and particularity requirement of Rule 23.1, Fed.R.Civ.P., is nearly identical to those requirements in Delaware Chancery Rule 23.1.

17. *Aronson* applied the standard of pleading in Delaware Chancery Rule 23.1, but as noted above, the Delaware and federal procedural rules are nearly identical.

Plaintiff argues that based on the allegations that the defendants corrupted the auction process by acting to benefit management to the detriment of other shareholders, he meets both prongs of *Aronson.* As to the first prong, plaintiff has alleged that defendants used corporate funds solely to further their own control of the company, that they implemented a shareholder rights plan to prevent any hostile takeover, that they favored the management buyout group over other bidders and that they stifled any competitive bids for the company. *See Derivative And Class Action Complaint* (Doc. # 1) ¶¶ 27–28, 33–34, 42, 67–68. These particularized factual allegations create a reasonable suspicion that defendants had an entrenchment motive when they failed to seek or to consider any competitive bids for the company.[18] *See Moran,* 490 A.2d at 1071 (demand excused because complaint alleged that rights plan implemented by board deterred all hostile takeover attempts); *Carmody v. Toll Bros., Inc.,* 723 A.2d 1180, 1189 (Del.Ch.1998) (same); *In re Chrysler Corp. S'holders Litig.,* 1992 WL 181024, at *4–5 (Del.Ch. July 27, 1992) (same). Accordingly, based on the allegations of the complaint, demand on the board is excused under the first prong of *Aronson.*[19] *See Grobow,* 539 A.2d at 186.

For these reasons, the Court finds that plaintiff has shown good cause why the Court should not dismiss Count I under Rule 12(b)(6) based on failure to plead Count I as a derivative claim. Count I alleges a derivative claim and plaintiff has alleged sufficient facts to establish that board demand would have been futile. On or before **March 29, 2004,** plaintiff may seek leave to amend his complaint to add a direct claim based on the auction process.

**IT IS SO ORDERED.**

---

18. Plaintiff has sued six of the seven TransFinancial directors. As to the Management Buyout Group (O'Neil, Laborde and Cox), plaintiff alleges that these defendants had a financial interest and entrenchment motive. *See Derivative And Class Action Complaint* (Doc. # 1) ¶¶ 27–28, 33–34, 42, 67–68. As to the remaining directors (Hill, Stewart and Taggart), plaintiff alleges that they voted to implement a shareholder rights plan to prevent any hostile acquisition and to entrench their control of the company, that they used corporate funds to entrench the Management Buyout Group, and they took several steps to facilitate the Management Buyout Group offer for no legitimate corporate purpose. *See id.*

¶¶ 27–28, 33. In addition, as to the directors who served on the Independent Committee (Hill and Stewart), plaintiff alleges that they stifled competitive bids for the company for no legitimate business reason. *See id.* ¶ 42.

19. Although defendants state that this Court's prior analysis of demand futility did not address Count I, they do not directly dispute that plaintiff has alleged sufficient facts under Count I to excuse board demand. *See Individual Defendants' Brief In Opposition To Plaintiff's Supplemental Brief In Response To The Court's Order, Dated November 21, 2003* (Doc. # 54) at 6.